Byron MOSER and Rosa Cerf Berger, Individually and for Themselves as Owners and Holders of Certificates of Beneficial Interest in the Shares of the Mercantile-Commerce National Bank in St. Louis and in Behalf of and Representatives of All Other Persons Similarly Situated, Plaintiffs-Appellants,

v.

Albert M. KELLER, Carl F. G. Meyer, Edgar M. Queeny, John S. Swift and William H. Luyties, All Individually and as Trustees Under a Certain Trust Agreement dated June 11, 1934, Creating a Trust of the Capital Stock of Mercantile-Commerce National Bank in St. Louis, and the Mercantile-Commerce Bank and Trust Company, a Trust Company, Defendants-Appellants.

No. 45400.

Supreme Court of Missouri,

Division No. 1.

April 8, 1957.

Motions for Rehearing or to Transfer Court en Banc Denied June 10, 1957. Opinion Modified on Court's Own Motion June 10, 1957.

**136**

Susman, Mayer & Willer, Herman Willer, Gerald A. Rimmel, Earl Susman, St. Louis, for plaintiffs-appellants.

Thompson, Mitchell, Thompson & Douglas, James M. Douglas, James P. Brown, St. Louis, for defendants-appellants.

COIL, Commissioner.

Plaintiffs, as owners of certificates of shares of beneficial interest in a certain trust, brought this class action to recover from defendants an amount claimed due on the price of certain bank stock purchased by defendant Trust Company from defendant trustees. The trial below resulted in a plaintiffs' judgment for $161,256.44 from which both plaintiffs and defendants have appealed. Defendants here contend that the trial court erred in entering any judgment for plaintiffs, and plaintiffs contend that the judgment should have been for $256,356.20.

In 1929 two St. Louis banks consolidated. The Mercantile Trust Company and the National Bank of Commerce formed the Mercantile-Commerce Bank and Trust Company. The charter of the National Bank of Commerce was retained to facilitate the transfer of fiduciary duties to the new bank. The capital of the National Bank of Commerce was reduced to $350,-000, consisting of 3,500 shares of $100 par value stock and a surplus of $75,000. The Mercantile-Commerce Bank and Trust Company owned all of that stock. In August 1930, the Mercantile-Commerce Bank and Trust Company opened a subsidiary bank in midtown St. Louis under the retained charter of the National Bank of Commerce and changed the name of the new bank to the Mercantile-Commerce National Bank in St. Louis (hereinafter referred to as "National Bank").

In 1933 the board of governors of the Federal Reserve System directed Mercantile-Commerce Bank and Trust Company (that bank and its successor, Mercantile Trust Company, will be hereinafter referred to as "Trust Company") to divest itself of the ownership of the shares of stock of National Bank. As a result, and contrary to the contention of Trust Com-

pany as to the legality of its ownership of the stock of, and the operation of, National Bank, Trust Company complied with that order to the extent herein described. On June 11, 1934, Trust Company entered into a trust agreement whereby it transferred title to the 3,500 shares of National Bank's stock to five trustees. Those five trustees were directors of the Trust Company. They continued as such trustees until the termination of the trust. They are named in the caption hereof, although, since this appeal, two of them died and their respective executors were substituted.

Pursuant to the terms of the trust, the trustees issued to Trust Company 100,000 certificates of shares of beneficial interest in the trust estate. Trust Company in turn declared a dividend in kind on its 100,000 outstanding shares of stock whereby each of its shareholders received one such certificate for each share of stock. The trust instrument provided that the owners of certificates would, upon distribution of the trust estate, be entitled to one one-hundred-thousandth of the corpus for each certificate he held. The certificates as issued referred to the fact that the trust agreement was on file with Trust Company as agent for the trustees and to the fact that the trust agreement was made a part of the certificate. The certificates were negotiable and were traded in over-the-counter transactions so that at the trust's termination they were held by 2,205 persons residing in a widespread geographical area.

By Article V of the trust agreement, the trustees gave Trust Company an irrevocable option to purchase from trustees all or any part of the stock of National Bank at any time prior to the termination of the trust which, except for such option termination, was to end on June 11, 1954. On June 6, 1951, Trust Company exercised its option and on that same date gave trustees the 30–days' notice thereof as provided for in the trust instrument. Pursuant to that notice, the trustees met on June 6 and entered into a written agreement for the sale of the stock to Trust Company.

Article V of the trust agreement provided a method for determining the price which Trust Company was to pay for the National Bank stock in the event it exercised its purchase option. That provision with respect to price (which, as will appear, is the basis of the controversy in this case) was: "The price to be paid by said Trust Company upon the exercise of such option shall be the book value of the shares of stock so purchased as of the date of the exercise of the option. The book value of the total authorized shares then outstanding shall be determined by deducting from all the assets of the National Bank all of its liabilities, as shown by the books of said National Bank." (For the purposes of this case we shall treat the entire 3,500 shares of the National Bank stock as within the provisions of the foregoing clause relating to price, although there was another provision by which the Trust Company had the option to buy certain of the shares at a lesser price.)

The agreement between the trustees and the Trust Company for sale of the stock provided that the purchase price should be determined as of the opening of business on July 6, 1951, and that the purchase price was payable in this manner: That Trust Company pay trustees in cash on June 6, 1951, the sum of $1,659,530.15; that any balance due under the language of Article V as of July 6, 1951, would be paid on that date; and that the excess amount, if any, which the Trust Company had paid to trustees by reason of the cash payment referred to would be refunded to Trust Company.

On June 22, 1951, the trustees voted to then distribute to the holders of the certificates for shares of beneficial interest $12 for each such share, to distribute any balance as soon as practicable after July 6, 1951, and to notify the holders of the certificates of the termination of the trust and the distribution. The certificate holders were so notified, and many of them received that first distribution.

In the meantime, the president, executive vice-president, and auditor of Trust Company were of the view that under the method provided in the trust agreement the purchase price of the National Bank stock would be whatever amount the general ledger of the National Bank showed as its book value at the opening of business on July 6, 1951; that thus the certificate holders would not get the benefit of the depreciated value of the bank's furniture and fixtures and mechanical equipment, nor the advantage of having interest earned but not collected shown as an asset, because neither item was carried as an asset on the bank's books; but that, on the other hand, the certificate holders would have the advantage of the book-carrying value of the bonds owned by the National Bank even though their market value did not equal the book-carrying value. Those officers suggested to trustees that it would be more equitable to all concerned to arrive at the adjusted book value of the stock, taking into account the three items just mentioned.

Irrespective of who made the original suggestion or the exact negotiations by which it was accomplished, the fact is that on June 20, 1951, the trustees, through their secretary who was also an officer of Trust Company, instructed Price, Waterhouse & Company, independent accountants, as follows:

"The undersigned hereby request you to make a determination, in accordance with generally accepted accounting standards, of the book value of the total authorized and outstanding shares of the capital stock of the Mercantile-Commerce National Bank in St. Louis, as at the opening of business July 6, 1951, based on the Bank's records and accounts. Such determination is in reference to Article V, page 16, of a Trust Agreement dated June 11, 1934, creating a trust of capital stock of Mercantile-Commerce National Bank in St. Louis, copy of which is attached hereto.

"The determination should be made by deducting from all of the assets of said National Bank all of its liabilities, as shown by the books of said National Bank. The book assets, as shown by the books and sup-plementary records, should include all assets, and should be reflected on sound accounting principles. The book liabilities should include all liabilities determinable from the records, whether accrued or currently payable."

Oral instructions supplementing that letter were also transmitted to Price, Waterhouse representatives, from which the accountants understood that book value was to be determined by accruing assets and liabilities.

Pursuant to the foregoing instructions, the representatives of Price, Waterhouse reviewed, and to some extent checked, the figures and the principles involved in setting up the figures and computations which had been computed and set up by Mr. Ettling, auditor for National Bank. On July 12, 1951, Price, Waterhouse & Company reported to the trustees as follows:

"In accordance with your instructions, we have prepared the following computation of the book value of the total authorized and outstanding shares of the capital stock of the Mercantile-Commerce National Bank in St. Louis as at the opening of business July 6, 1951 from the statement of condition, trial balances and other records, and information and explanations furnished by officials of the bank. The various records which were used in preparing the computation and the information and explanations of officials did not indicate that there were any matters, other than those given effect to in the computation, which should be considered in determining the book value. It should be understood, however, that we did not make any audit of the statement or records on which the computation was based.

"Capital, surplus, and undivided profits as shown by statement of condition $1,691,963.19
Adjustments:
Portion of reserves not required 65,726.47
Income earned but not received, less income received but not earned 67,508.45
Assets previously charged off (principally furniture and fixtures, less depreciation) 110,575.66
Excess of amortized cost of securities over quoted market value at close of business July 5, 1951 (167,944.01)
Adjusted book value $1,767,829.76

"On the basis set out in the foregoing paragraph, the above computation presents fairly the adjusted book value of the total authorized and outstanding shares of the capital stock of the Mercantile-Commerce National Bank in St. Louis as at the opening of business July 6, 1951."

The trustees and the Trust Company accepted the adjusted book value approved by Price, Waterhouse & Company of $1,767,-829.76 as the total price to be paid for the stock. The trustees, after approving expenses incurred in the sum of $6,422.90, voted to distribute the additional cash received, either by a first and final payment of $17.614 to the certificate holders who had not theretofore received the $12 partial distribution, or by a second and final payment of $5.614 per share to those who had received the $12 partial distribution.

As the foregoing letter from Price, Waterhouse & Company indicates, the $1,767,-829.76 adjusted book value figure involved changing the figures as shown by National Bank's general ledger by adding new asset accounts, adding new asset items under existing accounts, eliminating certain reserves and reducing others which were carried as liabilities on the general ledger, and by reducing the "Investment and Securities" asset by deducting from the book-carrying value the difference between that figure and market price. The testimony was that while the changes made, which resulted in the adjusted book value, represented the application of sound accounting principles and practices, nevertheless, such changes could be made only by changing the National Bank's accounting system from a modified cash system to a complete accrual system.

It will be unnecessary, however, to here detail the items making up the adjusted figures, or to further discuss adjusted figures as such. That is because the parties to this case in the first instance each rely upon the language contained in Article V. Plaintiffs sought and now seek to recover as a result of the construction and application of the language of Article V, and defendants' position is that the proper construction and application of the language of Article V will result in no judgment for plaintiffs. Consequently, we may ignore the adjusted figures as such. The testimony concerning them, however, is important to show the nature of a particular account or item and to demonstrate the respective positions of the parties as to certain items.

Defendants contend that because the $1,-767,829.76 received by defendant trustees was $75,866.57 more than they should have received (under defendants' interpretation of the method provided in Article V), plaintiffs were entitled to no judgment; and plaintiffs contend, as we have heretofore noted, that the Trust Company under the language of Article V should have paid and the trustees should have received $2,-018,293.18, or an amount in excess of $250,-000 more than was received by the trustees.

The parties agree that the basic question for decision is the meaning of this language, contained in Article V of the trust instrument, here repeated: "The price to be paid by said Trust Company upon the exercise of such option shall be the book value of the shares of stock so purchased as of the date of the exercise of the option. The book value of the total authorized shares then outstanding shall be determined by deducting from all the assets of the National Bank all of its liabilities, as shown by the books of said National Bank."

Despite the fact that each party contends that that language is clear and definite, their respective constructions of the clause are conflicting and diverse. The initial controversy centers on the meaning of the phrase "as shown by the books of said National Bank," as that phrase is used in its context. It is apparent, and there is no contention to the contrary, that the words "as shown by the books of said National Bank" modify both phrases "all the assets" and "all of its liabilities." Consequently, the second sentence of the aforequoted lan-

guage may be paraphrased without changing its meaning, in this manner:

> The book value of the stock shall be determined by deducting all the bank's liabilities as shown by its books from all the bank's assets as shown by its books.

It would also appear that the initial question may be further isolated by stating it as, what are the "books of the bank" as that expression or its equivalent is used in the trust instrument?

Plaintiffs contend, as we understand, that "books of the bank" means all the books and records of the bank, of every kind and description, from which on examination the existence of an asset or a liability, and the exact nature of either, may be determined, without reference to the particular accounting system used by the bank in keeping its books. Plaintiffs say in that respect that the expression, *all* assets and *all* liabilities, as shown by the books of the bank, contemplates determining and computing *all* assets and *all* liabilities which can be discovered by any means within the four walls of the bank. The only meaning, therefore, which they ascribe to the words, "as shown by the books of the bank," is that those words limit the examination and determination to all the available data *within* the bank.

Defendants contend that the "books of the bank" means only the general ledger and subsidiary books tied into the general ledger, from which the published financial statements of the bank are prepared; that, therefore, the parties to the trust instrument were bound to accept as the sales price of the stock whatever figure resulted upon making a financial statement from the figures on the general ledger in accordance with the bank's accounting system then in use.

■ After a careful consideration of the language used in the trust instrument, in the light of the evident purpose to be accomplished by its use, and after having considered the authorities cited by the parties, we are of the view that the words "books of said National Bank" as used in the context above quoted meant: the books of the bank which correctly reflected all the assets and all the liabilities of the bank in accordance with the accounting system consistently used by the bank, provided that the accounting system consistently used was recognized in the banking business as an acceptable and approved system.

Before stating the reasons for that conclusion, we shall amplify some aspects of the practicable application of the formula which inevitably results from our conclusion. We have said the books of the bank which "correctly" reflect, etc. It would be proper, therefore, to determine that all assets and all liabilities which should be on the general ledger under the system of accounting in use, were in fact thereon, and if any had been omitted, to include them. Likewise, it would be proper to determine that no accounts were on the general ledger which were not properly there under the system of accounting in use, and if there were any such, to remove them. Furthermore, after having determined that the books contained the proper accounts under the system of accounting in use, it next should be determined that the accounts so shown were not only mathematically correct but that those accounts reflected the correct amounts they should have reflected under the accounting system in use. Now, in making all the foregoing determinations, one would not be limited to or bound by the general ledger and the supporting or "tied-in" subsidiary books and records, but, on the contrary, one would properly use any and all books and records as well as otherwise available information.

We should observe also, in connection with our conclusion, heretofore noted, that we have not reached the question of what the effect might be if, contrary to the facts in the instant case, the evidence showed that a particular accounting system had been adopted or substituted for the sole and specific purpose of lowering the sales

price of the stock on a fixed date under the sale agreement.

Another matter we should make clear prior to a statement of the considerations which have prompted our conclusion is this: The evidence shows that the National Bank had used, since its beginning in 1930 and continuously and consistently thereafter, an accounting or bookkeeping system described as a "modified cash system" or "partial accrual system." There was no evidence which tended to indicate that there had been any variation in the consistent use of that system or that any asset or liability account had been added or removed for the purpose of affecting the book value of the stock under the sale price set forth in the trust instrument in the event of the exercise of the option. The evidence tended to show that the same accounting system was used by the National Bank for its almost four years of operation prior to the date of the trust agreement as was used subsequent to that agreement. The evidence further showed that the modified cash or partial accrual system was a recognized accounting system in the banking field. The evidence was that a modified cash or partial accrual system of keeping bank books involves the accrual of no assets but permits the accrual of particular liabilities. That system of accounting is distinguished from a complete accrual system wherein it is mandatory to accrue all assets and to accrue all liabilities, and distinguished from a cash accounting system whereunder no assets or liabilities are accrued. For our purposes, the important fact is that, irrespective of the label given the bookkeeping system of the National Bank, its books had been kept continuously and consistently under the same acceptable accounting system.

In construing the pertinent language of Article V of the trust instrument, we note the positions of the parties at the time of the execution of the trust instrument. That is to say, we take cognizance of the fact that the trust itself was admittedly and obviously a device whereby an asset owned by the stockholders of the Trust Company would in effect be sold originally to those same stockholders, and, if the Trust Company, as representative of its stockholders, so chose, repurchased by Trust Company as an asset for the benefit of its stockholders. True, the certificates of beneficial interest which went to Trust Company stockholders were negotiable and the evidence is that those certificates were bought and sold as shares of stock are bought and sold. It follows that the Trust Company and the trustees knew that some of the certificates would undoubtedly have found their way into the hands of nonstockholders of the Trust Company and probably into the ownership of strangers to both banks at the time of the exercise of the Trust Company's option. Nevertheless, in construing the meaning of the language of Article V, we attach some significance, however slight, to the fact that the Trust Company and the trustees, rightly or wrongly, had devised a means by which Trust Company could retrieve an asset which it felt it should not have been required to sell in the first place. It is likely, under those circumstances, that the parties thereto would intend that the repurchase price would be determined by a method which would not require an evaluation of assets and liabilities divorced from National Bank's established accounting system. And, in that same connection, we further note the evident probability that it was contemplated by the parties to the trust agreement that, in the event of the exercise of the Trust Company's option, National Bank would then be and would remain a going concern.

Also of some background significance, in our view, is the very fact that the price at which the stock was to be sold to Trust Company was designated in the agreement as its "book value." We do not mean to say or imply that the mere fact that the expression "book value" was used is decisive or persuasive in determining the *method* by which that "book value" was to be determined. But we do mean that it is of some significance that it was the "book

value" that was to be determined rather than market or actual value. While the term "book value" may have different connotations, depending upon the circumstances in which the expression is used and depending upon the business or the profession of the person using that term, yet, the very words themselves, "book value," do imply a readily determinable value which may be an arbitrary value.

As we have indicated, however, the matters above-mentioned are not, in our opinion, decisive considerations in the construction of the language used. They are, however, somewhat corroborative of the conclusion we have reached. The decisive consideration in our view is the language of Article V which was used to fix the source from which, or the standard by which, all assets and all liabilities were to be determined, viz., "as shown by the books of said National Bank." Now it would appear that the words, "as shown by the books of said National Bank," can have no logical meaning unless some explanatory phrase is added. It seems to us that the proper additional phrase is, "the books of the bank referred to are those which reflect all assets and all liabilities according to the accounting system consistently followed by the National Bank." True, the expression used, "as shown by the books of said National Bank," is not followed by the words we have indicated. Likewise, however, we find no indication that the language "as shown by the books of said National Bank" referred to any other books or records of the bank than those which were kept in accordance with the way the bank consistently kept its books. In other words, the system of accounting must be "tied in" to ascertain what "books" are referred to as the "books of said National Bank." "Book value" determined by the "bank's books" must of necessity, it seems to us, mean book value as shown by the books which have been kept consistently under a sound accounting system.

We reach the same conclusion when we consider the meaning of the language used from the standpoint of a prospective purchaser of one of the certificates of beneficial interest. In that connection, we have noted that the certificate of beneficial interest indicated on its face that the trust agreement was made a part of it, and specifically referred to the irrevocable option given to the Trust Company to purchase the National Bank stock. We think it is clear, therefore, that the purchaser of a certificate was charged with knowledge of the terms and conditions of the trust instrument including the method therein prescribed for fixing the price of the National Bank stock in the event the Trust Company exercised its option. One deciding whether to purchase such a certificate would attempt to determine its present and prospective value. We cannot believe that the prospective purchaser of such a certificate would understand from the language used in Article V that the Trust Company, if it exercised its option, was bound to pay or the trustees were bound to receive a price for the National Bank stock except as that price would be determined by the books of the bank kept in accordance with the manner in which the bank consistently kept its books. Otherwise, the prospective purchaser would have no apparent or fixed criterion or standard by which to estimate the prospective value of his certificate.

It remains to apply the formula set forth in Article V as we have construed the meaning of the language used. Were all the asset accounts on National Bank's general ledger which should have been there under the modified cash or partial accrual system of accounting? We need to determine in that respect first whether the two assets, viz., the depreciated value of improvements, furniture, fixtures, and equipment, and income earned but not collected on loans and securities and for service charges, should have been reflected as assets under the modified cash system of accounting consistently used by National Bank.

We shall consider the furniture and fixtures item. No such item appeared as an asset on the general ledger. No such asset account had ever appeared on the general ledger and no such asset was shown in the National Bank's statements. The reason the item did not appear on the ledger was because the National Bank had charged it off immediately after payment therefor and thus there was never an asset to list. There were records, perhaps books, wherein the depreciated value of furniture and fixtures was reflected for tax purposes. There is testimony in the record to the effect that the item would be properly shown under a complete accrual system of accounting but not under a cash or modified cash system of accounting. We are unable, however, to perceive any connection between the particular accounting system in use and the question of whether the depreciated value of the furniture and fixtures should have appeared on the general ledger as an asset for the purpose of the price-fixing formula of the trust agreement. It would appear that whether the furniture and fixtures item should have been carried as an asset depended not upon whether the National Bank consistently used a certain system of accounting, but rather upon the judgment of management and the practice followed as a result thereof. It is not difficult to understand why a bank would not consider the depreciated value of its improvements, furniture, fixtures, and equipment as the type of asset which the bank should show among its assets on a statement of condition or why a bank would show such an asset as having a value of only $1. The value of such an asset is highly speculative and is scarcely the type of asset which could be used to offset the bank's liability to depositors. Consequently, we do not mean to comment adversely on the common practice of banks to carry such an item at $1 or in eliminating it from its statement of condition. The fact is, however, that the furniture and fixtures item was admittedly an asset. The Trust Company president said it was a hidden asset. Its value was fixed by the officer of the National Bank. Consequently, inasmuch as both parties rely upon the strict application of the formula of Article V and, inasmuch as we are of the opinion that furniture and fixtures was an asset which would properly appear on the general ledger of the National Bank under the modified cash system of accounting consistently used by that bank for the purposes of Article V, we are of the opinion that $85,037.39 should be added to the assets.

We next consider the item described as income earned but not collected. No such item appeared or ever had been listed as an asset on the general ledger. While concededly an asset, the item in question would not properly be shown as an asset under National Bank's system of accounting until that earned income was actually received by the bank. The income had not been received and consequently, under the provisions of Article V, as we have construed them, and strictly applied (as the parties insist they be), that item should not have appeared as an asset on the general ledger as of July 6, 1951.

There was a category in the asset column of the general ledger labeled "Prepaid Expenses and other Assets." As of July 6, 1951, two items appeared thereunder and those are not in controversy. There are, however, four other items which plaintiffs claim should have been there set forth as assets as of July 6, 1951. Those and the claimed amount of each are: Missouri bankers' excise tax, $6,675.70; Federal deposit insurance assessment, $11,348.14; rent expense, $1,090.32; and casualty insurance, $6,424.11. The auditor for the National Bank testified that the absence of those four items from the assets on the books of the National Bank as of July 6, 1951, was consistent with the system of accounting used by the National Bank. Again, however, we should examine those items to determine whether they would properly have appeared as assets under the modified cash system of accounting, even

though it might have been the bank's *practice* to delay the actual entry until a later time.

The federal deposit insurance assessment was a credit that was due the National Bank because of what turned out to be overpayment of premiums for prior years. There is nothing in the evidence to indicate that the credit should not have been treated the same as though cash had been returned to the bank prior to July 6, 1951. It appears, therefore, that the amount of that credit, $11,348.14, should have been treated as an asset for the purpose of determining the selling price of the stock.

The National Bank, prior to July 6, 1951, had paid the Missouri bankers' excise tax for the entire year 1951, had paid rent on the bank quarters for the month of July 1951, and had paid premiums on various insurance policies which had varying future expiration dates. To compute the portions of such payments which applied to the time after July 5, 1951, and to show the difference as an asset on the general ledger as of July 6, 1951, would amount to accruing assets. The National Bank would not properly, under its consistent use of a modified cash system of accounting, accrue assets. It follows that the three items last mentioned were not properly assets as shown by the books of the National Bank.

In the application of the formula, we next consider whether the asset accounts on the general ledger reflected the amounts they should have reflected under the modified cash system of accounting. (As noted, there is no issue as to the mathematical correctness of any figures.) Defendants' witness, B. F. Jackson, a partner in Price, Waterhouse & Company, a certified public accountant and in charge of the work performed by Price, Waterhouse, testified: "If I were to prepare a statement of a book value of the outstanding shares of capital stock for Mercantile Commerce National Bank in St. Louis *on modified cash basis* which the Bank has been keeping its books as of the opening of business July 6, 1951, *in compliance with Article V*, as I under-stand it; but on a sound basis in accordance with a modified cash basis, *I would make certain adjustments * * *"* (our italics) in the amounts of the accounts reflected on the general ledger. Certainly under that testimony we must make the upward corrections in the amounts stated by the witness. So doing, in so far as such increased the assets, the effect is to increase assets as reflected on the general ledger in the total sum of $25,063.25. This total increase results from the elimination of two and the reduction of three reserves which appeared on the general ledger under "Liabilities." Plaintiffs, of course, do not question the addition of the above-stated amount to assets, but they do strenuously contend that one of the three reserves which was only reduced should have been eliminated entirely and thus the assets increased by reason thereof in the additional sum of $5,256.35. The item in dispute is "Reserve for Interest" and plaintiffs contend that no part of that reserve was a liability as of July 6, 1951. The particular interest reserve in question was for interest payable on savings deposits. The reserve, shown on the general ledger as of July 6, 1951, was in the amount of $14,197.-43. That account had been carried on National Bank's books under "liabilities" since June 30, 1931. The National Bank had contracted with savings depositors to pay interest on savings at the rate of one per cent (rate applicable at time in question) on June 1 and December 1 of each year, on all sums then in the bank and which had remained on deposit for 30 days or more. It was conceded that there was no obligation on National Bank to pay interest on sums that were withdrawn prior to an interest-paying date. What the National Bank did in reducing the reserve of $14,197.43 to $5,256.35 was to compute the average savings department balance from the last interest payment date, viz., June 1, 1951, through July 1, 1951, applied to that average balance a rate of interest of .0084 of one per cent which resulted in the $5,-256.35 figure. The rate applied was one based on the National Bank's experience over the two prior six-months' periods and

to that extent took into account the fact that the over-all interest payment due was (due to the contractual provisions noted) less than the one per cent rate.

Plaintiffs do not question the method employed or the accuracy of the resulting computation. They contend that at the opening of business on July 6, 1951, there was no liability to pay any amount to anyone. Plaintiffs say that a liability is a contractual obligation, something owed, by a business enterprise; that, consequently, a reserve is not a liability because it is an estimate of an amount to be appropriated from undivided profits to meet a legal obligation which may arise in the future but which does not exist until the date for the discharge of the obligation arrives. And, as we understand, plaintiffs, therefore, make the existence of a contractual obligation to pay depend upon whether the exact amount which will satisfy the obligation is known or may be mathematically calculated with certainty.

It appears to us, however, that National Bank on July 6, 1951, had a contractual obligation to pay one per cent on the savings deposits as of December 1, 1951, which met the requirements heretofore noted. The exact amount of that obligation was contingent on future events. But the obligation existed and from a practical standpoint the amount of the reserve, as reduced, represented a reasonable estimation of the amount of money it would take to satisfy that obligation on December 1, 1951. We think that the particular reserve in question amounted to nothing more than an accrual of a liability which was proper under National Bank's consistently used accounting system. We need not attempt to determine from an accounting standpoint whether a reserve is technically a "liability." Whatever it is, it is in this instance an amount which properly reduced assets in accordance with National Bank's accounting system. It follows that the assets as shown by the books of the National Bank should not be increased by the additional sum of $5,256.35.

The additional items in controversy are: "Unearned discount on installment loans," an item under the heading, "Income Received but not Earned," in the amount of $48,278.27 shown on the general ledger as a liability; "Reserve for installment loans" in the amount of $31,846.20 shown on the general ledger as a liability; and "Reserve for taxes" in the amount of $51,197.77 shown on the general ledger as a liability. We shall consider the foregoing matters in the order stated.

The question as to the first item is whether the full amount of $48,278.27, unearned discount on installment loans, shown on the general ledger of National Bank as of July 6, 1951, correctly reduced assets in that amount in accordance with the accounting system consistently used by the bank. That account had been on the general ledger since September 1937. The circumstances giving rise to such an account may be best explained in this manner: When a borrower receives money on a note to be repaid monthly which does not provide for any interest prior to the maturity of the note, the bank discounts the note at the time, e. g., gives the borrower $96 for a $100 note. The National Bank enters such a note on its "installment loan account" at $100, the face value. The "cash account" is credited with $96. The $4 is entered as a credit to the "unearned discount account." When the borrower makes a monthly payment on the note, a credit is made both on the $96 and on the $4. The bank has a formula for determining how much of each monthly payment is credited against the $4.00. (The respective contentions of the parties make it unimportant to explain that detail.) There was no legal obligation on the National Bank to rebate any part of the discount, i. e., the $4, but the invariable custom of the National Bank was to rebate the unearned portion of the discount if the note was paid before maturity.

It is plaintiffs' contention that the bank had collected the interest at the time of the

transaction, that there was no legal obligation ever to refund any portion of that interest or discount, and, therefore, the National Bank's asset was the face amount of such notes, not subject to reduction simply because the bank had set up a device to defer the receipt of the income already received over the entire period of the loan. (It should be noted that the account with which we are now concerned had nothing to do with, but was separate and apart from, a reserve for *losses* on loans and which reserve included these installment loans.)

Defendants' position is that while there was no obligation to refund the discount the National Bank did have an obligation to render services in connection with the loan and that the unearned discount represented the value of services to be rendered. The services referred to are, say defendants, permitting money to remain in the hands of the borrower, accepting payments, keeping proper records, holding safely any security given, and releasing the borrower and surrendering the security upon final payment.

We are of the view that whether the instant item properly reduced the assets of the National Bank for the purposes of fixing the sales price of the National Bank stock does not depend, as has been the case with other items, upon what kind of an accounting system was being consistently used. The question here is whether the face amount of the notes represented the asset without reduction by the amount of the "unearned discount" account. Now it is true, in the example heretofore used, that the bank, at the time it received an executed installment note for $100 and gave the borrower $96, did not then have the $4 in the sense that it had then received it from the borrower. But the bank had received the $4 in advance in the sense that it had an asset of $100 which included the bank's $4 discount. Now the bank, as we shall subsequently hold, had set up a proper reserve against which any loss on that note would be charged. Under those circumstances, we think the bank's account labeled "Unearned Discount on Installment Loans" was a

method or practice to spread income over a given period of time. There was nothing wrong with the practice. It probably was a good banking practice. But under the formula in Article V, as we have construed it, the National Bank should not have reduced its assets in the amount of $48,278.27 for purposes of determining the purchase price of the stock.

The labeled account "Reserve for Installment Loans" was a reserve to provide for losses on loans which might prove to be uncollectible. Despite the label, that reserve included all types of loans and was not limited to installment loans. That reserve account had been on the general ledger since August 1937. The reserve was set up by monthly charges to the profit and loss account in amounts determined by National Bank's management as proper additions to that reserve. When a loan was determined to be a "bad loan" it was then charged off against that reserve. It was conceded by defendants' expert witness that a reserve for losses on loans is never a liability but is an accrual based on management's judgment of the amount of loss the bank will experience in collecting the loans; such a reserve is applied against the assets to demonstrate management's opinion as to the collectibility of those assets; in effect, it is a reduction in the value of an asset after an evaluation of that asset has been made. It may be explained as an estimate of an existing decrease in value of the asset. Consequently, the net value of the loans shown on the general ledger is the figure shown less the reserve for losses on those loans.

The reserve as carried on the general ledger of National Bank as of July 6, 1951, was in the amount of $31,846.20. National Bank's auditor, in adjusting the account, reduced the amount to $16,141.19. Plaintiffs contend that the entire $31,846.20 was not a liability as of July 6, 1951, and, therefore, should not have reduced the assets in any amount. Defendants contend that unless plaintiffs were willing to accept the adjusted figures as a whole, prepared on a complete accrual basis, National Bank was

justified in treating the net value of its loans as $31,846.20 less than their face value, rather than at only $16,141.19 less than face value.

Plaintiffs take the position that whether such a reserve should be set up and its amount are matters of policy to be decided by management, but that the only question here is whether that reserve was in fact a liability. Plaintiffs' argument is that whether it was a liability depends upon whether, on July 6, 1951, there was a contractual obligation to pay out any part of that reserve and that admittedly there was not.

While it appears that the instant reserve was carried on the general ledger under liabilities, it is clear to us that the nature of the reserve was such as to fix the net value of the asset. That is to say the asset on the general ledger, "Loans and Discounts," was the face amount thereof less the $31,846.20 reserve. In applying the formula, i. e., deducting from all assets, all liabilities, we think it was proper to consider the Loans and Discounts asset as shown by the books of the National Bank as $6,683,735.87, rather than $6,715,582.07, unless we further determine that the reserve was excessive.

As noted, the reserve was reduced to $16,141.19 for the purpose of arriving at an adjusted book value. The National Bank's auditor made the reduction on the basis of a formula approved by the Internal Revenue Service to determine the amount a bank may deduct in any single year as loan losses for income tax purposes. There was testimony that even under that formula the National Bank could have had a reserve for loan losses equal to three times the one-year amount and that such would have been acceptable to the Treasury Department. There was also the testimony of the two accountants from Price, Waterhouse & Company to the effect that they would not have reduced the loan reserve because it appeared to be reasonable, but that they were willing to *approve* the reduction inasmuch as it had been made by the bank's auditor. It also appears that the

reserve of $31,846.20 was less than ½ of 1 per cent of National Bank's total loans and discounts. Defendants argue that the adjustment was made as part of a "package deal" and not in an attempt to follow the method of determining the price provided in the trust agreement; that because plaintiffs seek to recover under the language of Article V of the trust agreement and, in effect, refused to accept the adjusted figures, we should determine whether the reserve as it appeared on the general ledger ($31,846.20) constituted a proper reserve.

There is merit in that position and in the supporting argument. The difficulty, however, as we view the matter, is that the evidence does not permit us to conclude what the real reason was for the reduction in the reserve. The National Bank auditor testified that the amount of reduction in the reserve represented an amount "which we felt under good accounting principles should be transferred or added to the book value, transferred back to the undivided profits as being unneeded reserve as of that particular date." And if that were true, then whether the reserve was excessive had nothing to do with the acceptance or rejection of a "package deal." Admittedly there is other testimony concerning the reduction and some of it supports defendants' present contention, but, in view of the foregoing statement by National Bank's auditor, we must hold in accordance with that statement that the reserve for loans as shown on the general ledger was excessive by $15,705.01.

The final controversy centers on the reserve for taxes. That reserve showed on the general ledger as a liability in the amount of $51,197.77. In the adjusted figure that reserve was reduced to $26,239.56, but only because the adjusted figures included a reduction in assets of $167,944.01 by reason of the change in the value of the bonds from book-carrying value to market value. That is, the reduction in bond value would have offset taxable income, thus making it improper to include a further reduction in assets by reason of a tax reserve.

The question now is whether the $51,-197.77 figure was a proper amount in which to reduce the net assets. There is no dispute about $26,239.56 of that amount because that sum was owed by National Bank on July 6, 1951, on 1950 income tax, and plaintiffs concede that amount was a liability. Basically, plaintiffs' position is the same on this item as their position with reference to the reserve for interest on savings deposits which we have decided adversely to plaintiffs. Briefly, plaintiffs say there was no income tax due and payable as of July 6, 1951; that any income tax which the National Bank might owe would become due and payable at the end of 1951; that, therefore, there was no *liability* for income taxes as of July 6, 1951, except the undisputed amount due on 1950 income. Plaintiffs argue that even though the amount of tax on the bank's income from January 1 to July 6, 1951, could be calculated, nevertheless, the bank's operations for the period from July 6, to December 31, 1951, may have been such as to cause losses sufficient to wipe out the tax accrued during the first six months of the year.

The account, reserve for taxes, had been on the National Bank's general ledger continuously since the inception of the bank. Under the system of accounting consistently used, a reserve for tax liability had been accrued. We again reject plaintiffs' theory that a liability within the meaning of Article V was only a contractual liability to pay a certain sum on some date prior to July 6, 1951. The National Bank had an obligation fixed by law to pay income taxes. The obligation existed on July 6, 1951; the only contingency was the amount payable on a date after the close of 1951. There was no evidence that the reserve shown on the books, if properly there, was not in a reasonable amount. We hold, therefore, that the $51,197.77 reserve for taxes properly reduced the assets in accordance with the formula for determining the price of the stock.

The method for the application of the formula, as we have construed Article V, encompassed the right of National Bank (as well as the certificate holders) to add to the items reflected on the general ledger as of July 6, 1951, any item that should have appeared thereon under the National Bank's system of accounting. The evidence shows one such liability item, viz., $2,905.61 for salaries incurred but not paid. Plaintiffs admit that such is a proper liability to be taken into account in determining the sale price of the stock. Furthermore, the evidence is that the reserve for taxes, if allowable as we have held it was, should have been increased by $1,281.35. The two items under "Income received but not earned," viz., safe deposit box rents and discounts on time loans, totaling $12,843.60 set up as a liability in the adjusted figures, would not properly appear on the general ledger as of July 6, 1951, under the modified cash system of accounting consistently used by the National Bank.

The applications hereinabove made of the method or formula provided in Article V for fixing the sale price of the stock are reflected in the following computation:

Capital, surplus and undivided profits as shown by statement of condition prepared from general ledger as of July 6, 1951 ..... $1,691,963.19

We have held these items should have been added to the figure last shown:

A new account, labeled Depreciated Value of Improvements, Furniture, Fixtures and Equipment ..... 85,037.39

A new account, labeled Credit from Federal Deposit Insurance Assessment ..... 11,348.14

The following items in the amounts indicated in accordance with the testimony of defendants' certified public accountant:

| | | |
|---|---|---|
| Elimination of Reserve for Federal Deposit Insurance | $6,175.93 | |
| Reduction of Reserve for Interest | 8,941.08 | |
| Elimination of Reserve for Miscellaneous | 387.56 | |
| Elimination of Special Reserve | 1,505.65 | |
| Reduction of Reserve for Social Security Taxes | 8,053.03 | 25,063.25 |
| Elimination of Unearned Discount on Installment Loans | | 48,278.27 |
| Reduction of Reserve for Loans | | 15,705.01 |
| | | $1,877,395.25 |

We have held these items should have been deducted from the figure last shown:

| | | |
|---|---|---|
| Salaries Incurred but not paid | $2,905.61 | |
| Increase in Reserve for Taxes | 1,281.35 | 4,186.96 |
| Amount which should have been paid by Trust Company | | $1,873,208.29 |
| Amount paid by Trust Company | | 1,767,829.76 |
| Difference | | $ 105,378.53 |

We have cited no cases in the foregoing portion of this opinion. That is because we have found no Missouri authorities applicable to the issue determined. The cases cited from other jurisdictions do little more than demonstrate that the meaning of "book value" is variable depending upon the facts of a given case, and that the meaning of "books of a bank" is likewise dependent upon particular circumstances. The problem has been to construe the language used by the parties in this particular trust instrument. We are of the opinion that a discussion of the authorities cited in the briefs would add nothing to or change the result we have reached.

█ It is necessary to extend this long opinion to consider three other matters. Plaintiffs contend that the court costs and any attorneys' fees which may be allowable to plaintiffs' counsel should be surcharged against defendant trustees. The basis for the contention is that alleged fault and conduct of the trustees made this litigation necessary and consequently that this is a proper case for the exercise of the power of a court of equity to surcharge the trustees. Plaintiffs point out, among other things, the dual capacities of trustees, i. e., that they were stockholders of Trust Company and trustees for the holders of the certificates; that the same attorney represented the Trust Company, the trustees, and the National Bank; that the trustees were simply following the wishes of Trust Company without independent consideration of their duty to receive a proper amount for the National Bank stock.

It appears to us, however, that, irrespective of all other questions, the sole issue was and is what price the trustees should have received for the stock. No acts of the trustees and no failure on their part to act resulted in harm to the certificate holders, unless some affirmative act or failure to act *caused* the trustees to obtain less than they should have for the stock. In that respect, the trustees relied upon and accepted a figure as the amount they should receive which had been fixed by a reputable firm of accountants and only after receiving the advice of their counsel. The opinion herein demonstrates that the amount they should have received in excess of what they did receive was wholly dependent upon the construction of particular language. That there were, and undoubtedly still are, divergent views as to the proper construction of that language is apparent. The trustees, whatever their relationship to the banks and the certificate holders, whatever their action or inaction, and whatever their reasons therefor, finally arrived at a figure for the sales price of the stock, which, even if wrong, was based on sound reasons. We hold, therefore, that the trial court correctly refused to surcharge the trustees with the costs and plaintiffs' attorney fees.

█. Plaintiffs also contend that the trial court erred in failing to allow the named plaintiffs, Mr. Moser and Mrs. Berger, interest on the money admittedly due them for their certificates for the period September 19, 1951, to April 16, 1953. The basis for that contention is this, plaintiffs say that the trustees refused to pay named plaintiffs the $17.614 per share for their certificates except upon condition that such payment be accepted as a final distribution and upon condition that their certificates be cancelled; that such was an improper restriction on the payment of money admittedly due the beneficiaries.

Plaintiffs say that on July 20, 1951, beneficiaries received a notice from the trustees to the effect that they would (if they had not theretofore received a partial payment) receive "a first and final payment" of $17.-614 per share and that "thereupon all right, title, interest and estate of said holders in, under and to said Trust shall finally cease

and determine." Plaintiffs further contend that on September 19, 1951, they made demand on trustees for payment to them of $17,614 per share without any requirement of an admission that payment was in full and that such demand was refused; that on April 14, 1952, plaintiffs filed a motion in the trial court to compel payment by trustees of the amount admittedly due without conditions or restrictions and that such motion was overruled without prejudice; that on April 21, 1952, named plaintiffs were refused payment except by check bearing a legend "final distribution." On April 16, 1953, named plaintiffs were paid the amount admittedly due them by cashier's checks bearing no legend.

We are of the view that the trial court correctly refused to enter a judgment for the interest claimed. The record shows that the only time there was any refusal to pay when named plaintiffs presented their certificates in accordance with the provisions of the trustees' notice was on April 21, 1952. At that time there was a motion pending in the trial court for an order compelling payment. Payment was refused pending an order of the trial court in the matter. Thereafter the only time plaintiffs presented their certificates in accordance with the directions contained in the trustees' notice, they were paid. Under the circumstances, we hold that named plaintiffs have not established that trustees refused to turn over to the beneficiaries trust property except upon an unlawful condition.

■ Finally, defendants contend that the instant action may not be maintained as a class action; that any judgment should be only the prorata amounts due named plaintiffs by reason of the number of certificates held by each. We are of the opinion that the allegations of plaintiffs' petition and the proof adduced demonstrate that this action is properly a class action. Section 507.070 RSMo 1949, V.A.M.S., as supplemented by Supreme Court Rule 3.07, 42 V.A.M.S., provides in substance and in part: If persons constituting a class are very numerous or it is impracticable to bring them all before the court, such of them as will fairly insure adequate representation of all may sue on behalf of all (provided the facts showing such adequate and fair representation are alleged and proved) when the right sought to be enforced on behalf of the class is a common or secondary right, secondary in the sense that the owner of the primary right refuses to enforce it and a member of the class thereby is entitled to enforce it.

There is no issue here as to the fact of numerous parties or the impracticability of bringing them all before the court. There is further no doubt that named plaintiffs were members of a class, viz., the holders of certificates of shares of beneficial interest in a trust. We are also convinced that named plaintiffs were class members situated so as to adequately and fairly represent the class and that the allegations and proof so show. The meritorious question on this aspect of the case is whether plaintiffs as class representatives sought to enforce the kind of right set forth in Section 507.070, subsection 1(1), the substance of which we have set forth above.

■ Defendant trustees had the duty as trustees to preserve the corpus of the trust estate for the beneficiaries (the certificate holders) and upon the exercise by Trust Company of its option the trust corpus (shares of stock) was to become cash. Trustees, thus, had the duty to receive from Trust Company as corpus of the trust the amount of money for the National Bank stock as prescribed in Article V of the trust agreement. Trustees, having that duty, necessarily had the right to demand from Trust Company the amount of money provided for in the trust agreement. The evidence shows that trustees refused to demand from Trust Company any sum in addition to that which had been paid by Trust Company. And that secondary right of the certificate holder to enforce the right of the trustees to receive the amount provided for in the trust agreement was also a common right. That is to say, while the claim

·of each certificate holder was a several, as opposed to a joint claim of all, nevertheless, the right to be enforced was common to all who made up the class of the holders of certificates of shares of beneficial interest in the trust. Citizens Banking Co. v. Monticello State Bank, 8 Cir., 143 F.2d 261, 264. The fact that the amount recoverable by each certificate holder as his prorata share of any addition to the corpus of the trust might be monetarily different, depending on the number of certificates each held, does not militate against the fact that the right to be enforced was common to all certificate holders. Redmond v. Commerce Trust Co., 8 Cir., 144 F.2d 140, 151.

It follows from all the foregoing that the judgment of the trial court is reversed and the case is remanded with directions to enter a judgment consistent with this opinion.

VAN OSDOL ad HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.

### On Motion for Rehearing

COIL, Commissioner.

In their motion for rehearing, defendants contend that the principal opinion failed to take into account the impact, income-tax-wise, of the result of our holding as to two items. We held that the sum of $11,348.14, which was a credit due the National Bank because of prior overpayment of insurance premiums, should have been treated, for the purpose of fixing the selling price of the stock, the same as though cash had been received by the bank in that amount prior to July 6, 1951. We also held that an item shown on the books of the bank as a liability as of July 6, 1951, styled "Unearned Discount on Installment Loans," in the sum of $48,278.27, should have been eliminated as a liability, which, of course, thereby increased the undivided profits account by that amount.

It would appear that if we correctly have required the bank, in so far as its accounting with the certificate holders is concerned, to treat the $11,348.14 credit as cash, then it must follow that that amount was income which was not, but should have been, taken into account by the bank in figuring its reserve for taxes as of July 6, 1951. It would also appear that inasmuch as we have required the bank to eliminate from its liabilities as of July 6, 1951, $48,-278.27 unearned discount on installment loans, and have thereby added that amount to undivided profits, such unearned discount must of necessity have passed through the "interest received account" as income. Thus it seems clear that the reserve for taxes as of July 6, 1951, also should have taken into account the amount of income tax which would have been due had the bank's books reflected the unearned discount on installment loans account as we have said it should have reflected it.

It follows that we should have held, and we hereby modify our opinion and hold, that by reason of the manner in which we have required the defendants to treat the FDIC credit and the Unearned Discount on Installment Loans account, the reserve for taxes which we allowed in the principal opinion in the sum of $51,197.77 should have been allowed in the sum of $80,443.63. The effect of which holding is to decrease the amount which should have been paid by the Trust Company as shown at page 23 of the (typewritten) principal opinion [303 S.W.2d 149] to $1,843,962.43, and to thereby decrease the difference in the amount which should have been paid and the amount which was paid by the Trust Company to $76,132.67.

The foregoing adjustments are arrived at in this manner:

| | | |
|---|---:|---:|
| FDIC credit treated as cash | $11,348.14 | |
| Total surtax and normal tax rates applicable to such additional amount of income (shown by defendants' Ex. 20) 50% per cent. Applied, results in additional income tax which would have been due and thus the reserve for taxes should have been increased by | | $ 5,759.18 |
| Elimination of unearned discount on installment loans which discount as a result went into income | $48,278.27 | |
| Less item never deducted for income tax purposes (allowed defendants on p. 23 of typewritten opinion [303 S.W.2d 149] as "salaries incurred but not paid") | $ 2,905.61 | |
| | $45,372.66 | |
| Total surtax and normal tax rates (50¾%) applicable to such additional amount of income. Applied, results in additional income tax which would have been due and thus the reserve for taxes should have been increased by | | $23,026.62 |
| Mathematical error of $460.06 in the item shown on p. 23 of the principal opinion [303 S.W.2d 149] as "Increase in Reserve for Taxes." Item there shown as $1,281.35; should have been $1,741.41; thus increasing reserve for taxes | | $460.06 |
| Total increase in Reserve for Taxes | | $29,245.86 |

That increase subtracted from $1,873,208.29 (amount shown as that which should have been paid by Trust Company, p. 23 of typewritten opinion [303 S.W.2d 149]) leaves the sum of $1,843,962.43 as the amount which should have been paid by Trust Company.

The opinion is further modified by substituting the following sentence for the last sentence of the third paragraph which appears on page 14 of the typewritten opinion [303 S.W.2d 144]: "It appears, therefore, that the amount of that credit, $11,348.14, should have been treated as an asset for the purpose of determining the selling price of the stock."

It is therefore ordered that:

Motion of plaintiffs-appellants for modification of the opinion, or for rehearing, or to transfer to court en banc, is overruled;

Motion of defendants-appellants for rehearing, or to transfer to court en banc, or for modification of the opinion, is overruled;

The opinion is modified on the court's own motion in the respects hereinabove indicated and the case is remanded to the trial court with directions to enter a judgment consistent with this opinion.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.